[Crim. No. 540.  Third Appellate District—January 6, 1921.]

## THE PEOPLE, Respondent, v. EDWARD T. NEWSOME, Appellant.

[1] CRIMINAL LAW — MANSLAUGHTER—VERDICT—EVIDENCE. — In this prosecution for the crime of murder, in which the defendant, a peace officer, was convicted of the crime of manslaughter, the verdict was amply supported by the evidence.

[2] ID.—APPEAL—POWER OF APPELLATE COURT TO SET ASIDE VERDICT —WEIGHT OF EVIDENCE.—The appellate court can interfere and set aside verdicts in criminal cases only when it can be justly declared, as a proposition of law, that the verdict is without the necessary evidentiary support; and the fact that there is a conflict in the evidence, or that certain witnesses stated facts in giving their testimony at the trial that they did not state in testimony given by them at the coroner's inquest and the preliminary examination, does not render the testimony for the people or the testimony of said witnesses inherently improbable.

[3] ID.—ARREST BY PEACE OFFICER—USE OF FORCE—RIGHT TO TAKE LIFE OF OFFENDER.—A peace officer, when attempting to arrest a person charged with a public crime, or who has committed a public offense in the presence of the officer, or whom the officer has probable cause for believing has committed a crime, may use all necessary force to effect the arrest, or may take the life of the purported offender if it becomes necessary to save or preserve his own, but there must be a real or apparent necessity to justify the resort by the officer to such an extreme measure for his own safety or protection.

APPEAL from a judgment of the Superior Court of Stanislaus County.  L. W. Fulkerth, Judge.  Affirmed.

The facts are stated in the opinion of the court.

L. J. Maddux for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

HART, J.—Under an information charging him with the crime of murder, the defendant was convicted of the crime of manslaughter, in the superior court in and for

3. Homicide by peace officer in attempting to enforce his commands against innocent persons, note, L. R. A. 1918D, 379.

the county of Stanislaus, and he appeals from the judgment and the order denying his motion for a new trial.

[1] The single ground upon which the defendant attempts to sustain his appeal is that the evidence does not support the verdict. It is only necessary briefly to repeat herein some of the testimony received at the trial to show that the point relied upon by the defendant is entirely without merit.

The homicide occurred at the town of Newman, in Stanislaus County, in the early morning of November 26, 1919, and the name of the party slain was Felix Van Vleet. The defendant, Newsome, at the time of the homicide, was a night policeman in the town of Newman, a position he had held for several years.

On the evening of November 25, 1919, at the hour of 6:30, the witness, A. Swanson, who was then employed as a truck driver for a concern in Newman known as the Globe Dairy Products Co., having previously arranged to go to the ranch of a Mr. Azavedo, near Newman, to get some turkeys for use on Thanksgiving Day, started for said ranch in an automobile, accompanied by the deceased and two other persons, named, respectively, Hansen and Michaels, the last named a lad about sixteen years of age. After Swanson and his companion arrived at said ranch and the former had made his wants known to Azavedo, the latter proceeded to catch or gather the number of turkeys desired by Swanson. While Azavedo was so engaged, Swanson and the deceased went into the tank-house on the Azavedo premises, filled two jugs with wine and placed them in the automobile or truck used by Swanson in going to the ranch. The required number of turkeys was caught and placed in the truck, and thereupon the party started on the return home. On arriving at Newman, the machine was stopped near a soft-drink saloon owned and conducted by one Kilburn, and Swanson, deceased, and Hansen went into said saloon, Michaels remaining on the outside near the machine. Swanson testified that his object in stopping at and going into the Kilburn place was to leave a turkey there for a friend of his, a railroad conductor by the name of Brown. On the way from the Azavedo ranch to Newman each of the said men named drank freely of wine from the jugs. At Kilburn's, Swan-

son, Hansen, and Van Vleet had several drinks of cider. While in the saloon word came to them that the turkeys were escaping from the truck and Hansen thereupon went out to recapture them. He was shortly followed by Swanson and the deceased. Swanson was then feeling the effects of the wine to some extent. Just as he was about to "crank" his machine, preparatory to starting for his home, some one of the party called attention to the fact that Newsome was approaching, and Swanson, in a voice sufficiently loud to be heard by Newsome, made a very offensive remark relative to the latter. Newsome thereupon stepped from the sidewalk, delivered a blow on Swanson's head with a policeman's "billy," and was about to take him to jail, when one Moreno, a cousin of Swanson, interceded for the latter and persuaded the officer to allow Swanson to proceed on home. After Swanson and his friends arrived at the former's house, they discovered that the two jugs of wine were missing. It was thereupon agreed between them that they would return, find Newsome, Swanson would apologize for the offensive reference he had made to the officer, and then undertake to persuade the latter to return to them the wine. Swanson and the deceased went back to the street where last they saw the defendant, and upon seeing the latter, who was walking along the street at some distance from them, called him in a loud voice, saying that they desired to see him. Newsome (now quoting from the testimony of Swanson), "didn't pay any attention to me and kept on walking, and then Van Vleet called to him and he walked out in the middle of the street and stopped, and he said he wanted to see him a minute; and while he stopped he says 'What do you want?' and I says, 'Mr. Newsome,' I says, 'I came back to apologize to you for how I addressed you on the other side of the street about a half an hour or so ago,' and he says—I started to apologize to him about the trouble we had and the words I remarked about him and I told him that I didn't want to have no trouble; and he says, 'All right,' he says, 'that's all right,' he says, 'I don't want to have any trouble—would not be any trouble, it was all right'; so then I asked him if I might have that jug of wine that he had taken out of my truck for Thanksgiving dinner, and I told him I would like

to get it. And he says, 'No,' he says, 'you can't have that,' he says, 'I have got it locked up,' he says, 'I want it for myself.' He says, 'You can't have it,' and Mr. Van Vleet says, 'Well,' he says, 'we are going home now; give us the wine, will you?' and just about that time why the way he said it why we kind of laughed at him and he pulled out his gun and he struck at Mr. Van Vleet or struck at me, we were pretty close together, and I kind of ducked the blow and he hit Mr. Van Vleet in the head and knocked him down.''

Swanson, proceeding, said that the first blow delivered by the defendant on the head of the deceased knocked the latter to the ground, he falling on his knees toward defendant, and that while on the ground deceased grabbed the defendant by the left wrist; that defendant also went down on his knees; that defendant, while deceased was on his knees, beat him (deceased) on the head seven or eight times with his gun.

Continuing, Swanson testified: ''I told Mr. Newsome, 'We didn't come up here for any trouble,' and I says, 'We don't want any trouble,' and he asked me to help him, and I says, 'All right,' and so I got hold of Mr. Van Vleet's arm and pulled it out from him and started to raise him up, and when he asked me to help him he says, 'Let go,' and Van Vleet says, 'No,' he says, 'I won't let go,' and he says, 'If you don't let go,' he says, 'I will kill you,' and Van Vleet says, 'Go ahead and kill me if you want to,' and so I started to raise him up and just as soon as I got him off his knees he began to shoot, and he shot three times. Q. Well, now, was there a handcuff exhibited there during the time? A. Yes, he put one handcuff on Van Vleet. Q. When did he do that? A. When he beat him over the head the first time and had him on his knees, you know, he beat him over the head and then he reached around and put one handcuff on him. Q. Which hand did he put that handcuff on? A. Well, he—I think it was his left hand—left wrist. Q. Did Van Vleet have the handcuff on when you—when you say you took hold of him to raise him up? A. Yes.''

Swanson further testified that when Newsome first struck deceased the latter was standing with his hands in his pockets; that, when defendant fired the first shot, the

deceased was in the act of getting up from the ground to which he previously had been knocked by Newsome; that immediately following the first shot the other two were fired in rapid succession. The witness positively testified that he saw no club or other article in the hands of the deceased, and that he would probably have seen it if a club or other article had been in either hand of deceased. The witness continued to say that, while Van Vleet was lying on the sidewalk, Newsome ran up to him (witness) and said to the latter: "Give me that club," to which witness replied: "I have got no club"; that thereupon defendant reached down and picked up a club or had it in his hand; that, at about that time, one Hazelbecker appeared on the scene and defendant turned to him and said, showing Hazelbecker the club he held in his hand: "You see that—you see that—that's evidence enough."

Hazelbecker, also an employee of the Globe Dairy Products Co., and who at the time of the homicide was working on the "night shift," testified that while he was on his way home, and when near the point where the shooting took place, he first heard and his attention was arrested by some loud talking, which was followed within a brief time by three gunshots, which succeeded each other without any appreciable space of time between them. The shooting having ceased, he started toward the part of the street where it occurred, when he saw the deceased, in a "fast staggering walk," going toward the sidewalk, reaching which he fell to the curbing. The witness corroborated Swanson as to the fact that a handcuff was on the left wrist of deceased and testified, as did Swanson, that he saw no club or other article which might be regarded as a weapon in the possession of the deceased or until defendant called his attention to a "billy" under the hat of deceased in the street. The witness said that Swanson, after fruitlessly attempting to get Van Vleet to speak while the latter was lying on the sidewalk, addressed defendant, saying, "Damn it, Ed, you shot this man," and that defendant replied: "Well, I had to, the damn s—— of a b——."

Dr. Armistead, the physician who was called to attend Van Vleet while the latter was yet lying on the sidewalk,

and who later conducted an autoptical examination of the deceased, testified that, in response to a telephone call from the defendant, he went to the scene of the shooting and found that Van Vleet had expired, his body lying in the position as described by the witnesses Swanson and Hazelbecker. The physician, upon examination, found a bruise on the side of the head and over the left ear, three incised cuts on the scalp, and a bruise on the chin, of the deceased. At the *post-mortem* examination, the autopsy revealed three gunshot wounds in the body of the deceased, to wit: one which entered and passed through the chest, a necessarily fatal wound; one which entered and passed through the abdomen, cutting the intestines in five different places, and entering into and passing through the bladder, thence into the pelvic bone, in which the bullet was imbedded, and one in the wrist.

It is not necessary to reproduce here more of the testimony received at the trial in support of the information than that of which the above is in substance a full statement, for it is very clear that what has already been given sufficiently shows that the verdict, even if, in fact, it was not justified (a proposition which it is not for this court to attempt to solve), is, nevertheless, amply supported. In fact, it is idle to argue that the above testimony does not show at least a clear case of manslaughter, of which crime the defendant was convicted. Indeed, an examination of the evidence as it is presented before us would, in our opinion, justify the conviction in any fair and impartial mind that there was no valid reason or any real necessity for the slaying of Van Vleet by the defendant. It is true that the latter made the claim, and so testified at the trial, that he was only doing his duty as a peace officer when undertaking to subdue and arrest the deceased; that the latter struck at him with a club or "billy," and that he was in fear that Swanson would join the deceased in an assault upon him, the inference from that testimony being that the shooting became necessary for the protection or defense of himself against personal injury or perhaps the loss of his life. But, even from the testimony of defendant, considered in its entirety, it is not clear that the taking of Van Vleet's life was necessary. The defendant appeared to have the better of the deceased at all

times, having knocked him to the ground several times and succeeded in putting a handcuff on one of his wrists; and the defendant's testimony does not clearly show that Swanson at any time made any serious demonstration or movement indicating an intention or purpose to assist the deceased in resisting or assaulting the defendant. But, however this all may be, the testimony for the people certainly shows that the killing of Van Vleet was not at all necessary—that, indeed, there was even no apparent necessity for it. It further clearly shows that Newsome was bent upon killing the deceased, for he fired the three shots in rapid succession, if the testimony for the people speaks the truth. But it was, of course, for the jury to say from the whole evidence whether the killing of Van Vleet was or was not committed with malice, and their verdict evidences their conclusion that, while unlawful, the homicide was not the direct result of malice aforethought in the slayer.

[2] There is, as must be conceded, a sharp conflict in the evidence as to some of the important facts and circumstances attending the killing. It is also made to appear that Swanson and Hazelbecker, the principal witnesses for the people, added to their testimony at the trial a few facts and circumstances, more or less damaging to the accused, to which they did not testify at the coroner's inquest and the preliminary examination of the charge. They sought to excuse their omission to testify previously as fully as they testified at the trial by explaining that they were not at the inquest or at the preliminary hearing before the magistrate asked any specific questions as to the particular facts and circumstances which they added to their later stories of the homicide. But these were all considerations going to the weight of the evidence and entirely for the jury to solve. There is nothing in the fact of the conflict in the evidence, or in the fact that the witnesses named stated facts in giving their testimony at the trial relative to the homicide that they did not state in testimony previously given by them, which renders the evidence for the people or the testimony of said witnesses inherently improbable. This court can interfere and so set aside verdicts in criminal cases only when it can be justly declared, as a proposition of law, that the verdict

is without the necessary evidentiary support. We cannot say that in this case. To the contrary, the conclusion to which we are forced by the careful examination we have given the evidence is that the verdict appears to be impregnably fortified evidentially, if not, indeed, characterized by a more liberal measure of leniency than was actually warranted.

[3] It may, in conclusion, be added that a peace officer, when attempting to arrest a person charged with a public crime, or who has committed a public offense in the presence of the officer, or who the officer has probable cause for believing has committed a crime, may use all necessary force to effect the arrest, or may take the life of the purported offender if it becomes necessary to save or preserve his own, but there must be a real or apparent necessity to justify the resort by the officer to such an extreme measure for his own safety or protection. The testimony, especially that produced by the people, does not show that such a necessity, either real or apparent, arose in this case. However, for the reasons given, the judgment and the order appealed from should be affirmed, and it is so ordered.

Prewett, P. J., *pro tem.*, and Burnett, J., concurred.